**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

SCURRYFUNGE INC., SE MICHIGAN STORAGE INC., and GR MOVING AND STORAGE, LLC,

Plaintiffs,

v.

UNITS FRANCHISING GROUP, INC.,

Defendant.
_______________________________________/

Case No. 2:25-cv-13577-SJM-DRG
HON. STEPHEN J. MURPHY, III
Magistrate Judge David R. Grand

**FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiffs, Scurryfunge Inc., SE Michigan Storage Inc., and GR Moving and Storage, LLC (collectively, "Plaintiffs"), by and through their undersigned attorneys, and pursuant to the Court's Order dated August 25, 2026 (ECF No. 20) granting Plaintiffs leave to amend, hereby submit this First Amended Complaint against Defendant, UNITS Franchising Group, Inc. ("Defendant" or "UFG"), and in support thereof, state as follows:

**NATURE OF THIS ACTION**

1. This case involves an unfortunately all too familiar example of a franchisor, motivated by the greed of its founder/owner, Michael McAlhany, that has used its vast power in the franchise relationship to extract more fees and payments from its franchisees than it is contractually entitled to receive, both directly

and indirectly, through undisclosed vendor relationships. Since the inception of the franchise relationship, Plaintiffs were destined to fail because their decision to invest in the UNITS brand was premised on false and misleading representations, made in the pre-sale disclosure documents Defendant, UNITS Franchising Group, Inc. ("UFG"), furnished to each Plaintiff. Specifically, UFG represented that its business operated according to a "proprietary system" that UFG developed pursuant to its experience in the industry—which included developing UNITS® Containers, UNITS® Portable Storage Delivery Systems, and a proprietary operating software. Plaintiffs later learned that these representations were untrue when made. In reality, identical containers and equipment were, and are, freely available to the general public and to UFG's competitors at materially lower prices, and the required operating software was a third party's off-the-shelf product.

2. Plaintiffs have each operated a UNITS franchised business during all times relevant to this dispute and each executed a franchise agreement with UFG in 2022.

3. Most recently, UFG forced franchisees to implement an ill-planned and defective point-of-sale system ("POS"), i.e., StoreSmart. Among other severe problems, the deficiencies with the POS caused billing errors and produced inaccurate reports, which wreaked havoc and caused financial harm to the franchisees' businesses and negatively impacted Plaintiffs' relationships with their

existing customers, all while UFG continued to charge excessive and duplicative software fees.

4. To make matters worse, and despite the many franchisees who are in dire financial straits or who have been forced to cease operations as a result of UFG's misrepresentations and other failures, UFG has continued to improperly force Plaintiffs to purchase non-proprietary products at significantly above-market rates from suppliers and brokers for its own personal benefit without regard to the reasonable commercial interests and economic well-being of its franchisees, and has concealed the true source and cost of those products throughout the franchise relationship, including by instructing its own "approved" vendors not to deal directly with franchisees.

5. UFG also exploited Plaintiffs' local marketing expenditures for its own long-distance moves ("LDM") by solely relying on Plaintiffs' customer leads to generate its LDM customers all while paying Plaintiffs nothing in return or remitting a mere flat fee. UFG has also diverted the National Advertising Fund contributions that Plaintiffs are required to pay—monies that may not be used to defray UFG's general operating expenses—to pay, among other things, UFG's own corporate salaries.

6. Through this action, Plaintiffs seek damages and restitution arising from UFG's fraudulent and negligent misrepresentations and concealment, its

breaches of the parties' franchise agreements, its violation of the Michigan Franchise Investment Law, its deceptive trade practices, and its unjust enrichment at Plaintiffs' expense.

## THE PARTIES

7. Plaintiff, Scurryfunge Inc. ("Scurryfunge"), is a Michigan corporation with its principal place of business in Bloomfield Hills, Michigan. Scurryfunge entered into a Franchise Agreement with UFG effective May 23, 2022 (the "Scurryfunge Franchise Agreement").

8. Plaintiff, SE Michigan Storage Inc. ("SE Michigan"), is a Michigan corporation with its principal place of business in South Lyon, Michigan. SE Michigan entered into a Franchise Agreement with UFG effective September 1, 2022 (the "SE Michigan Franchise Agreement").

9. Plaintiff, GR Moving and Storage, LLC ("GR Moving"), is a Michigan limited liability company with its principal place of business in Ada, Michigan. All of GR Moving's members are citizens of Michigan. GR Moving entered into a Franchise Agreement with UFG effective February 26, 2022 (the "GR Moving Franchise Agreement").[1]

[1] Plaintiffs' respective franchise agreements are collectively referred to herein as the "Franchise Agreements." True and correct copies of Plaintiffs' respective Franchise Agreements are annexed hereto as **Composite Exhibit "A."**

10. Defendant, UNITS Franchising Group, Inc., is a South Carolina corporation with its principal place of business in Daniel Island, South Carolina. UFG is the franchisor of the UNITS Moving and Portable Storage franchise system and is a citizen of South Carolina.

**JURISDICTION AND VENUE**

11. Jurisdiction of this Court over this action is invoked pursuant to 28 U.S.C. § 1332(a)(1). There is complete diversity of citizenship between Plaintiffs, each of which is a citizen of Michigan, and Defendant, a citizen of South Carolina, and the matter in controversy exceeds, exclusive of interest and costs, the sum of $75,000.

12. Jurisdiction over UFG is proper because UFG had sufficient continuous and systematic minimum contacts with Michigan such that it foresaw the possibility of being sued in this state, including but not limited to, conducting significant business activities in this state, selling franchises in this state, collecting royalties in this state, and engaging in the conduct which is the subject matter of this dispute.

13. Venue is proper in, and UFG is subject to the personal jurisdiction of, this Court because UFG maintains a presence in this District via its franchisees, and all or most of the events giving rise to this action occurred in this District. 28 U.S.C. § 1391(b).

14. Venue is also proper in this District because M.C.L. § 445.1527(f) voids any provision in a franchise agreement that requires arbitration or litigation to be conducted outside the State of Michigan.

## GENERAL ALLEGATIONS

### A. The FTC Franchise Rule

15. UFG solicits prospective franchisees in Michigan and, in connection with each such offer and sale, is required to furnish a Franchise Disclosure Document ("FDD") to the prospective franchisee.

16. The FTC Franchise Rule, 16 C.F.R. Part 436, sets forth comprehensive requirements for franchise disclosure documents, including twenty-three (23) categories of information that must be disclosed in the FDD. 16 C.F.R. § 436.5.

17. Among other things, Item 1 of the FDD requires a franchisor to disclose the type of business the prospective franchisee will conduct, the general market for the product or service the prospective franchisee will offer, and a general description of the competition. *Id.* § 436.5(a).

18. Item 8 requires a franchisor to disclose the franchisee's obligations to purchase goods and services from the franchisor or from designated suppliers and, for each such obligation, "[w]hether the franchisor or its affiliates will or may derive revenue or other material consideration from required purchases or leases by franchisees," including the amount or percentage of such revenue. *Id.* § 436.5(h).

Item 8 further requires a franchisor to disclose whether "a designated supplier will make payments to the franchisor from franchisee purchases" and to "disclose the basis for the payment." *Id.* The FTC Rule expressly makes clear that "a 'payment' includes the sale of similar goods or services to the franchisor at a lower price than to franchisees." *Id.*

19. Item 10 requires disclosure of financing arrangements and whether the franchisor or an affiliate receives consideration for placing financing with a lender. *Id.* § 436.5(j).

20. Item 11 requires a franchisor to disclose to prospective franchisees the franchisor's principal assistance and related obligations of both the franchisor and franchisee, which, among other things, includes disclosing information regarding a franchisor's obligations to provide maintenance, repairs, upgrades, or updates. *Id.* § 436.5(k).

21. A franchisor's failure to set forth all material facts necessary for a prospective franchisee to make an informed business decision, and to present all material facts accurately in its FDD, constitutes an unfair or deceptive act or practice in violation of Section 5 of the Federal Trade Commission Act, *see* 16 C.F.R. § 436.2, and, as alleged herein, gives rise to liability under the Michigan Franchise Investment Law ("MFIL"), M.C.L. § 445.1501 *et seq.*

## B. Plaintiffs' Franchise Agreements and the Disclosure Documents They Received

22. GR Moving executed the GR Moving Franchise Agreement, effective February 26, 2022, on UFG's then-current standard form of franchise agreement (the "2021-Form Franchise Agreement"). Before executing its Franchise Agreement, GR Moving received UFG's Franchise Disclosure Document bearing an issue date of April 30, 2021 (the "2021 FDD") on or about August 3, 2021. A true and correct copy of the relevant portions of the 2021 FDD is annexed hereto as "**Exhibit B**."

23. Scurryfunge executed the Scurryfunge Franchise Agreement, effective May 23, 2022, on UFG's 2022 standard form of franchise agreement (the "2022-Form Franchise Agreement"). Before executing its Franchise Agreement, Scurryfunge received UFG's Franchise Disclosure Document bearing an issue date of April 29, 2022 (the "2022 FDD") on or about May 2, 2022. A true and correct copy of the relevant portions of the 2022 FDD is annexed hereto as "**Exhibit C**."[2]

24. SE Michigan executed the SE Michigan Franchise Agreement, effective September 1, 2022, on the 2022-Form Franchise Agreement. Before executing its Franchise Agreement, SE Michigan received the 2022 FDD on or about July 1, 2022.

---

[2] The 2021 FDD and the 2022 FDD are materially identical in each respect alleged herein, except as specifically noted. Likewise, the 2021-Form Franchise Agreement and the 2022-Form Franchise Agreement are materially similar in the respects alleged herein, except as specifically noted below.

25. At all relevant times, UFG alone drafted the FDDs and the Franchise Agreements and possessed exclusive knowledge of, and control over, the accuracy and completeness of the disclosures contained therein.

## C. UFG's Untrue Statements Regarding Exclusive Supply of the UNITS Equipment

26. Item 1 of the 2021 FDD and of the 2022 FDD describes the UNITS Business as one that operates according to UFG's "proprietary system," the characteristics of which include "branded containers (the 'UNITS® Containers') and related equipment, including trucks and robo-lifts referred to as 'UNITS® Moving and Portable Storage Delivery Systems' (collectively 'UNITS® Equipment')." Ex. B, 2021 FDD, Item 1; Ex. C, 2022 FDD, Item 1.

27. Item 8 of the 2021 FDD states: "Presently, we are the only approved supplier of UNITS® Containers, packing and moving supplies and UNITS® Moving and Portable Storage Delivery Systems." Ex. B, Item 8. Item 8 of the 2022 FDD states: "Presently, we are the only approved supplier of Containers, and UNITS Moving and Portable Storage Delivery Systems." Ex. C, Item 8. Item 8 of both FDDs further states: "We are **the exclusive supplier** of [UNITS®] Containers and other UNITS[®] Equipment, and **there are no alternate sources of supply**," and that "[y]ou are currently required to purchase the [UNITS®] Containers directly from us." Ex. B, Item 8; Ex. C, Item 8 (emphasis added).

28. Plaintiffs recently learned that UFG's representations were untrue when made. Not only is UFG **not** the manufacturer of any part of the UNITS® Equipment, but the third-party manufacturers (e.g., Cardinal, Boxwell, Hanover) sell the identical products to the general public, to traditional self-storage operators, and to UFG's competitors, at materially lower prices than UFG has charged Plaintiffs.

29. To the extent UFG contends that modifications it requested from its vendors (for example, to container pockets or to the mule design) render the products exclusive or proprietary to UFG, those modifications were not exclusive to UFG, and the vendors made the same or materially identical products and modifications available to their other customers.

30. Indeed, Certified Restoration Drycleaning Network ("CRDN")—a national restoration franchise headquartered in Michigan and a UFG national-account customer whose local franchisees Plaintiffs have serviced—has recently acquired identical containers from the same vendors and now operates its business using the same portable-storage containers, ***eliminating the need to work with any UNITS franchise***.

31. UFG knew its exclusive-supply representations were untrue when it made them. UFG itself contracted with these third-party vendors, UFG itself placed and paid for the orders, and UFG itself knew that those vendors sold the identical products to the general public and to UFG's competitors at materially lower prices.

32. UFG reinforced these material representations through Section 12.2 of the Franchise Agreements, in which UFG states that it "has developed and acquired a line of UNITS equipment," that the "UNITS Equipment developed and furnished by Franchisor are distinctive as a result of being developed pursuant to the combined experience of Franchisor and its Affiliate(s)," and in which the "Franchisee agrees to order and purchase all of its requirements of UNITS Equipment exclusively from Franchisor, its Affiliate, or a supplier designated by Franchisor." Ex. A, Scurryfunge Franchise Agreement § 12.2; SE Michigan Franchise Agreement § 12.2; *see also* GR Moving Franchise Agreement § 12.2 (materially identical).

33. Item 8 of the FDDs also set out the criteria that UFG represented it would apply to a franchisee's request to use an alternative supplier: "the ability to provide sufficient quantity of product; quality of products and/or services at competitive prices; production and delivery capability; and dependability and general reputation of the supplier." Ex. B, Item 8; Ex. C, Item 8. This representation, combined with the "no alternate sources of supply" representation, misled Plaintiffs into believing that the containers and equipment were the type of supplies that could not be purchased from any other vendor.

## D. UFG's Undisclosed Vendor Revenue, Relationships, and Purchasing Restrictions

34. Item 8 of the FDDs also quantified the revenue UFG derived from franchisee-required purchases. The 2021 FDD stated: "During our most recent fiscal

year ended December 31, 2020, we derived approximately $701,881 in revenue from required franchisee purchases and leases, which represented approximately 19.5% of our total revenues of $3,606,730." Ex. B, Item 8. The 2022 FDD stated: "During our most recent fiscal year ended December 31, 2021, we derived approximately $521,545 in revenue from required franchisee purchases and leases, which represented approximately 7.9% of our total revenues of $6,622,296." Ex. C, Item 8. On information and belief, these quantified disclosures understated the revenue, rebates, markups, and other consideration UFG, in fact, derived from franchisee-required purchases and from its vendor relationships.

35. While UFG's FDDs disclosed in general terms that UFG "reserve[d] the right to derive revenue" from required purchases, and while Section 12.1 of the Franchise Agreements recites that UFG has "the right to derive and to retain volume rebates, markups, and other benefits from suppliers," UFG failed to disclose the material facts necessary to make those statements not misleading, including: (a) the identity of the third-party vendors that actually manufacture the purportedly exclusive equipment (including Boxwell and Cardinal); (b) that those vendors sell the identical products to the general public and to UFG's competitors at materially lower prices; and (c) the basis for and magnitude of the payments and other consideration UFG received from Plaintiffs' required purchases, including the markup UFG imposed when it resold those products to Plaintiffs.

36. UFG likewise failed to disclose under Item 8 of its FDDs the purchasing restrictions it imposed in practice—including its refusal to permit franchisees to purchase used equipment or containers, to purchase equipment or containers from existing franchisees, or to purchase directly from UFG's own approved vendors—and the related financial benefits UFG received from franchisee-required purchases.

37. For example, UFG required Plaintiffs to purchase trucks through a broker (even though the trucks themselves are sourced directly from common manufacturers at a lower price) and trailers from a sole approved vendor, i.e., Cardinal, both in brand-new condition. On average, franchisees, including Plaintiffs, have waited more than six (6) months for the trailers to be completed by UFG's "approved" vendor, with some franchisees waiting nearly a year after submitting payment to receive their trailer. During this waiting period, or in the event a fleet truck or trailer is unavailable due to repairs (both of which are regular occurrences), franchisees, including Plaintiffs, were forced to either operate in a limited capacity or rent a used truck or trailer from UFG at an exorbitant price.

38. By way of example, on or around March 3, 2022, GR Moving ordered its truck and UNITS delivery system directly from UFG for $145,199.77, with a 20-to-26-week shipping term stated on the face of UFG's own sales order—i.e., delivery no later than approximately early September 2022. GR Moving received the last of its initial containers on June 4, 2022 and was otherwise fully ready to open, but UFG

did not deliver the truck until late October 2022, forcing GR Moving to open on October 22, 2022, after the industry's peak season had passed. The delay cost GR Moving an estimated $120,000.00 or more in lost rentals, and UFG refused GR Moving's request for even approximately $3,000.00 in royalty relief for the fourth quarter of 2022.

39. Plaintiffs have also faced persistent quality problems with the containers UFG sold them including water intrusion, pitting, and rust—problems magnified in Michigan, where snow, ice, and road salt attack untreated steel. The containers UFG sold Plaintiffs at above-market prices were the lowest-grade version its manufacturers offered: not galvanized, with inferior coating and no drip edges. UFG limited franchisees to a single container type in two sizes. UFG never disclosed that the same manufacturers offered galvanized containers and other configurations better suited to harsh climates, refused to permit Plaintiffs to source such containers elsewhere, and began offering galvanized containers only after counsel's November 2024 demand letter. On information and belief, that accelerated decay benefits UFG by design: the Franchise Agreements obligate franchisees to purchase minimum quantities of additional containers every year (the "Container Quota"), and every container that rusts out prematurely is replaced through UFG or its designated vendor at UFG's marked-up prices.

### E. UFG's Untrue Statements Regarding Its "Proprietary" Operating Software

40. Item 11 of the 2021 FDD required each franchisee to "purchase and use the information technology equipment and services that we designate, including **our proprietary UNITS® Operating Software**," and represented: "**We have developed proprietary software, UNITS® Operating Software**, to conduct scheduling, dispatching, accounting, inventory management, receivable tracking, point-of-sale functions, and related activities," and further: "**UNITS® Operating Software is our proprietary software and has been used by our affiliates in the operation of a similar business since January of 2005**." Ex. B, Item 11 (emphasis added). Item 11 of the 2022 FDD contains materially identical representations. Ex. C, Item 11.

41. These representations were untrue when made. The software that UFG, in fact, designated and required its franchisees, including Plaintiffs, to purchase and use was SiteLink—an off-the-shelf, commercially available software product owned and licensed by a third party—and not software that UFG developed, owned, or had used through its affiliates since 2005. UFG necessarily knew the identity, ownership, and history of the software it designated.

42. The representation that the operating software on which every essential business function would depend was UFG's own proprietary software, with a nearly two-decade operating history, was material to prospective franchisees' evaluation of

the UNITS opportunity.

43. UFG's subsequent conduct confirmed the falsity of these representations. In 2023 and 2024, UFG replaced SiteLink with StoreSmart, a system developed by a third-party software vendor, Suntek Solutions ("Suntek"), whose defects are described below.

**F. Plaintiffs' Reliance on UFG's Misrepresentations and Omissions**

44. Each Plaintiff received and reviewed its respective FDD before executing its Franchise Agreement, and each Plaintiff relied upon UFG's representations in Item 8 of the FDD that UFG was the exclusive supplier of the required containers and equipment and that there were no alternate sources of supply, and in Item 11 that the required operating software was UFG's own proprietary software, as part of that Plaintiff's ultimate decision to invest in the UNITS franchise opportunity.

45. Each Plaintiff was new to the portable storage industry. Those representations and omissions were material to each Plaintiff's decision to invest in the UNITS franchise opportunity.

46. Each Plaintiff reasonably believed that UFG, as an established franchisor subject to comprehensive federal and state disclosure requirements, would provide accurate and complete information about the franchise opportunity, and Plaintiffs had no reason to doubt the accuracy of UFG's representations at the

time they were made, and no independent means of verifying facts—such as UFG's supply-chain arrangements, vendor pricing, and software ownership—that were within UFG's exclusive knowledge and control.

47. Each representation on which Plaintiffs relied appears within the FDD itself, not in any extra-contractual communication, and each concerned facts as they existed when UFG furnished the FDD—what UFG then supplied, what it then charged, and what software it then owned—rather than any prediction about UFG's future performance.

48. Had each Plaintiff known that identical containers and equipment were available from third parties to the general public at materially lower prices, that UFG derived undisclosed revenue and other consideration from franchisee-required purchases and its vendor relationships, and that the required software was not UFG's own proprietary software, each Plaintiff would not have invested in the UNITS franchise system and/or would have negotiated materially different terms, and could have avoided substantial losses.

## G. UFG's Breaches of the Franchise Agreements

### *(i) The UNITS Equipment—Non-Competitive Pricing and Supplier Restrictions*

49. Section 12.2 of each Franchise Agreement obligates UFG to make the UNITS Equipment available to the franchisee and to do so at competitive prices, while limiting UFG to a reasonable profit. Specifically, Section 12.2 provides that

"Franchisor shall make the UNITS Equipment available to Franchisee in reasonable quantities . . . in accordance with the procedures for ordering, handling, and shipping stated in the Manual," and that:

> Franchisor **commits to provide the UNITS Equipment at competitive prices**; however, Franchisee acknowledges that Franchisor and its Affiliate(s) have the right to earn **a *reasonable* profit** on the sale of its UNITS Equipment.

Ex. A, Scurryfunge Franchise Agreement § 12.2; SE Michigan Franchise Agreement § 12.2; GR Moving Franchise Agreement § 12.2 (materially identical) (emphasis added).

50. After each Plaintiff executed its Franchise Agreement, and continuing to the present, UFG required each Plaintiff to purchase containers, mules, trailers, trucks, and other equipment exclusively through UFG or a supplier UFG designated, and charged prices that were not competitive and that yielded UFG a profit that was not commercially reasonable.

51. Notwithstanding UFG's contractual obligation under the Franchise Agreements, there is a substantial discrepancy between UFG's prices and the prices at which the same products are available directly from the vendors. The vendor that UFG has forced upon Plaintiffs offers containers at a significantly increased cost—in most cases, a mark-up of 50% or more when compared to the cost advertised by other third-party vendors for the same containers. On information and belief, the markup UFG charged Plaintiffs on Boxwell containers was the highest markup

Boxwell applied to any of its customers.

52. For years, UFG's sales orders stated only a single unit price per container—no manufacturer's cost, no vendor margin, and no UFG margin—with freight invoiced separately. Only after Plaintiffs filed this action did UFG announce its "Container Supplier Direct Purchase Program," under which container quotes are itemized into the manufacturer's cost, the vendor's charge, freight, tariff, and a disclosed "UFG Rebate" of $200 to UFG on every container, and which UFG touts as designed to "improve transparency." The itemized 2026 quotes reveal that the identical 16-foot container now costs less, fully loaded, than Plaintiffs previously paid, despite tariffs that did not exist prior to late 2025—meaning Plaintiffs paid approximately $1,000.00 or more per container in undisclosed margin. UFG thereby breached Section 12.2 of the Franchise Agreements by failing to provide competitive prices and by earning a commercially unreasonable profit on its sale of UNITS Equipment to Plaintiffs.

53. Section 12.1 of the Franchise Agreements establishes the process by which a franchisee may seek approval of an alternative supplier and provides that UFG "will decide within a reasonable time (usually thirty [30] days) after receiving the required information whether Franchisee may purchase or lease such items or services from such supplier." Ex. A, § 12.1. Item 8 of the FDDs discloses the objective criteria UFG represented it would apply. Ex. B, Item 8; Ex. C, Item 8.

54. Section 21.14 of each Franchise Agreement, titled "Duty of Reasonableness and of Good Faith," expressly provides:

> To honor the intent and purpose of this Agreement, and any of the documents referenced herein, **both Franchisor and Franchisee shall act reasonably and in good faith**. If the consent of either party is required or contemplated hereunder, the party whose consent is required shall not unreasonably withhold consent, unless such consent is expressly subject to such party's sole discretion pursuant to the terms of this Agreement.

Ex. A, § 21.14 (emphasis added). Thus, even where the Franchise Agreements confer discretion on UFG, UFG remains contractually bound to exercise that discretion reasonably and in good faith.

55. Yet any time Plaintiffs have sought alternative suppliers for equipment or containers, they have been met with blanket denials from UFG. Through emails from its Vice President of Franchise Operations, Erik Lorensen, and through its regional developers, UFG told its franchisees, including Plaintiffs, that all container and equipment purchasing must go through UFG directly, rendering a formal request under Section 12.1 futile. UFG maintained this position without explanation, without applying the criteria specified in Section 12.1, and without any legitimate business justification.

56. Over the past several years, UFG has placed a growing number of restrictions on its franchisees with respect to containers and equipment absent any legitimate business reason or contractual basis. Specifically, UFG has restricted

franchisees' ability to purchase: (i) identical or substantially similar equipment at a much lower price; (ii) used equipment or containers; and (iii) new or used containers and equipment from existing franchisees.

57. Even where UFG has designated an approved supplier (i.e., Boxwell), UFG has interfered with and interjected itself into the relationship between franchisees and the supplier by mandating that Plaintiffs purchase all containers and equipment exclusively through UFG at an inflated cost. In late 2024, when Plaintiffs could no longer sustain their ongoing operating losses and began to explore alternative container options at a more affordable cost, Plaintiffs learned that UFG had instructed its approved suppliers (i.e., Boxwell) to avoid direct communication with Plaintiffs for any container purchase-related inquiries and to redirect such inquiries to UFG. On information and belief, Boxwell honored UFG's instruction in order to maintain its ongoing business relationship with UFG.

58. UFG's refusal to consider reasonable alternatives not only compounds Plaintiffs' losses through increased container and equipment costs, but also negatively impacts Plaintiffs' ability to generate revenue due to delays and other issues associated with UFG's unreasonable specifications and payment terms.

***(ii) UFG Actively Concealed the True Source and Cost of the Equipment Throughout the Franchise Relationship***

59. Throughout the franchise relationship, and after each Plaintiff signed its Franchise Agreement, UFG had superior and, in material respects, exclusive

knowledge of facts not reasonably discoverable by Plaintiffs, including: (i) that the UNITS containers and mules were off-the-shelf products manufactured by third parties, including Boxwell and Cardinal, and sold to the general public at materially lower prices; (ii) the identity of the actual manufacturers of the equipment Plaintiffs were required to purchase; (iii) the prices at which those manufacturers sold the identical products to other purchasers; and (iv) the magnitude of the mark-up UFG imposed when it resold those products to Plaintiffs.

60. UFG knew that if Plaintiffs learned that the containers and mules were off-the-shelf products available at lower prices, Plaintiffs would purchase them elsewhere and UFG would lose its concealed mark-up. UFG therefore took deliberate steps, throughout the franchise relationship and after each Plaintiff signed, to prevent Plaintiffs from learning the truth, including: (i) continuing to represent to Plaintiffs during the relationship that there were no alternate sources of supply and that all purchasing had to go through UFG; (ii) ensuring that all purchases were routed through UFG; and (iii) instructing its "approved" vendors, such as Boxwell, not to communicate or transact directly with Plaintiffs and to redirect any franchisee purchasing inquiry back to UFG.

61. UFG also policed the flow of information by instructing franchisees in writing to refrain from calling UFG's container manufacturers directly and to direct all container questions, expressly including questions about costs, exclusively to

designated UFG corporate personnel. As explained above, UFG's sales orders stated only a single unit price, with no breakdown of the manufacturer's cost, Boxwell's margin, or UFG's margin, and freight was invoiced separately as containers shipped.

62. When Plaintiffs made direct inquiries of UFG—including when Plaintiffs raised the cost of containers and identified other third-party vendors that could provide containers at a lower cost—UFG, through its Vice President of Franchise Operations, Erik Lorensen, responded only that all container and equipment purchasing must go through UFG directly, without disclosing the true source of the equipment, the prices at which it was available to the public, or UFG's mark-up. As a result, Plaintiffs were structurally prevented from learning the products' true source and price.

63. Plaintiffs did not know, and in the exercise of reasonable diligence could not have known, of UFG's concealment or of the facts constituting the violations alleged herein until late 2024 at the earliest. UFG's affirmative concealment, its instructions to its vendors and franchisees, and its exclusive control of the supply chain prevented Plaintiffs from discovering those facts earlier. In fact, UFG is still actively concealing the commercially unreasonable markup to the present day. Shortly after UFG implemented its "Container Supplier Direct Purchase Program," GR Moving asked Boxwell in January 2026 for the same itemized breakdown for the 232 containers it had previously purchased. Boxwell declined and

advised GR Moving to communicate with UFG directly regarding its request; that breakdown has never been provided.

64. Had Plaintiffs known the concealed facts, they would have purchased equipment from alternative sources at lower prices, would not have paid UFG's inflated mark-up, and would have made materially different business decisions.

***(iii) Computer Software and Point-of-Sale System***

65. Section 11.5 of each Franchise Agreement requires the franchisee to "purchase and utilize computer and point-of-sale systems consisting of hardware and software in accordance with Franchisor's specifications and requirements, including Franchisor's designated software system," to "pay all then-applicable ongoing fees required in connection with the license of the designated software," and to pay "a software and point-of-sale system fee" that, "[a]s of April 2022, . . . ranges from $200 to $400 per month." Ex. A, Scurryfunge Franchise Agreement § 11.5; SE Michigan Franchise Agreement § 11.5; *see* GR Moving Franchise Agreement § 11.5 (materially identical; "[a]s of April 2021").

66. Section 9.2 of each Franchise Agreement grants UFG the right to "change or modify the System from time to time including, **without limitation**, . . . new or additional computer hardware, software, equipment, inventory, supplies, or sales and marketing techniques," provides that "Franchisee shall accept and use any such changes," and requires the franchisee to "make such expenditures as such

changes, additions or modifications in the System may **reasonably** require." Ex. A, § 9.2 (emphasis added). Section 13.1 further provides that "Franchisor shall be available to render advice, discuss problems, and offer general guidance to Franchisee by telephone, e-mail, newsletters, and other methods with respect to planning, opening, and operating the Franchised Business." Ex. A, § 13.1.

67. Prior to the launch of the StoreSmart software, Plaintiffs utilized SiteLink at a cost of approximately $236.00 per month.

68. Beginning in 2023, UFG used its discretion under Section 9.2 to designate a new POS/CRM system, StoreSmart, developed by a third-party software vendor, Suntek, and required franchisees to migrate to it. StoreSmart was defective. During its development, a small group of franchisees selected to test the software identified numerous bugs and glitches. UFG also knew there was a strong possibility that the StoreSmart system could not accommodate every franchisee in the system: UFG's own FDDs acknowledged that UFG "might not be able to alter the Proprietary Software Program and system to accommodate each and every franchisee of the System." Ex. D, 2023 FDD, Item 11; see also Ex. B, Item 11; Ex. C, Item 11 (same).

69. Beginning on or about January 1, 2024, UFG deployed StoreSmart to a group of three franchise locations that served, in substance, as an unpaid development and testing team for UFG: while operating their businesses on the

unfinished system, those franchisees identified and reported the defects from which UFG's vendor was still building the software. Additional locations were added in April 2024, and UFG then forced the remainder of the system's franchisees—including Plaintiffs—onto StoreSmart beginning in May 2024, all while charging franchisees the software fees described below.

70. Despite the known presence of bugs and glitches in the software and potential compatibility issues, the roll-out was accelerated. After deploying StoreSmart to a small group of franchise locations beginning in January 2024, UFG gave the remaining franchisees, including Plaintiffs, less than one month's notice, in May 2024, that they would be charged the new software fee and that the migration process would begin in June 2024. UFG deployed StoreSmart system-wide without adequate testing and during the portable-storage industry's well-known peak season (the summer months) when franchisees could least afford disruption. In connection with the roll-out, no support services or resources were made available to franchisees by UFG except for incomplete training videos.

71. The transition required franchisees to pay a one-time $250.00 migration fee for what UFG described as "data transfer." In addition, Plaintiffs' monthly software-related fees approximately doubled, from approximately $236.00 to approximately $500.00 per month, because Plaintiffs had no choice but to maintain SiteLink in order to access necessary client information that could not be accessed

through StoreSmart.

72. From the outset (May 2024), Plaintiffs experienced continuous and ongoing issues with the StoreSmart POS, including but not limited to: client billing issues; inaccurate royalty reconciliations; incorrect pricing of services; inability to process discounts to clients; incorrect or missing inventory counts; franchisees being billed by credit-card processing companies for initiating erroneous transactions; and inability to obtain reliable and accurate reports. These issues persisted through 2024 and 2025 and remained unresolved when Plaintiffs filed this action.

73. A ticket system was implemented by the software vendor, Suntek, to address the overwhelming variety of technical issues and problems experienced by franchisees. The records of that ticketing system reflect that, between January 8, 2024 and March 4, 2026, UFG franchisees, including Plaintiffs, submitted more than 5,200 support tickets concerning StoreSmart, hundreds of which concerned errors with direct financial consequences to franchisees and their customers, including billing and invoicing errors, sales-tax errors, duplicate charges, and overcharges. During the same period, Suntek issued 477 separate software releases—more than four per week for over two years—and many tickets were closed and reopened repeatedly because the underlying defect was never fixed. No meaningful solution has been provided to franchisees.

74. From the spring of 2024 through at least late 2025 and into 2026, Plaintiffs submitted dozens of trouble tickets documenting the same recurring failures: customers double-charged or charged the wrong amounts; charges posting in the wrong months and with the wrong due dates; charge lists that no longer have a total and were, in GR Moving's words, "all messed up"; duplicate and ghost container inventory; erroneous carry-over charges from SiteLink; unreliable rent-roll and financial reports; locked charges that could not be corrected; and online quoting systems that failed or went down entirely—including over a holiday weekend, prompting Scurryfunge to ask UFG to "remove the IP lock till you can get it working properly." In addition, SE Michigan's pricing structure could not be replicated in StoreSmart at all, causing the system to quote customers materially less than the actual cost of the services quoted—including long-distance services priced as local—for approximately six months before UFG and its vendor resolved the issue.

75. StoreSmart's erroneous and duplicate charges did not merely burden franchisees' operations—they inflated the "Gross Sales" recorded by the system, which is the base on which UFG computes and collects both its royalty and Plaintiffs' two percent (2%) monthly National Advertising Fund Contributions. UFG thereby computed and collected royalties and National Advertising Fund Contributions on revenue that did not exist and that its own defective system had

erroneously recorded.

76. UFG compounded that harm by imposing a policy limiting the period for which it would credit back royalties collected on erroneous charges—initially 90 days, later 120 days. The ticketing records reflect franchisees being told that UFG would not credit back royalties on StoreSmart-generated erroneous charges discovered outside that window. UFG has thus retained royalties and National Advertising Fund Contributions computed on phantom revenue generated by defects in the very system UFG forced upon its franchisees.

77. UFG has failed to distribute accurate and timely monthly operations reports to Plaintiffs since the migration took place in May 2024. UFG's own Director of Financing has acknowledged the delays caused by the myriad issues stemming from the premature launch of StoreSmart. UFG acknowledged the significant issues with StoreSmart on several occasions but has yet to offer any meaningful relief or resolution to franchisees. Meanwhile, despite its inability to provide franchisees with functioning software, in 2024 UFG collected in excess of $100,000.00 in monthly software fees from its franchisees.

78. Since the launch of StoreSmart, Plaintiffs have been unable to fully devote their time and efforts to the actual operation of their businesses and instead have been forced to spend countless hours identifying, reporting, and correcting the billing and other errors caused by StoreSmart, all while UFG has continued to insist

upon the payment of excessive and duplicative fees for a system it knew did not work.

### *(iv) National Advertising Fund/Brand Fund*

79. Section 10.3 of each Franchise Agreement requires the franchisee to "make monthly National Advertising Fund Contributions equal to two percent (2%) of that month's Gross Sales," and provides that the National Advertising Fund (the "Fund") "shall be maintained and administered by Franchisor or its designee" subject to the requirements of Sections 10.3.1 through 10.3.5. Ex. A, § 10.3.

80. Section 10.3.1 of GR Moving's 2021-Form Franchise Agreement provides, in relevant part:

> All National Advertising Fund Contributions shall be maintained in a separate account from the monies of Franchisor and **shall not be used to defray any of Franchisor's general operating expenses**, except for such reasonable costs and expenses, if any, that Franchisor may incur in activities reasonably related to the administration of the National Advertising Fund.

Ex. A, GR Moving Franchise Agreement § 10.3.1 (emphasis added). GR Moving's Franchise Agreement contains no exception for salaries of any kind.

81. Section 10.3.1 of the 2022-Form Franchise Agreements (Scurryfunge and SE Michigan) contains the same prohibition, with an exception expanded to include "the salaries of employees who manage marketing agencies, administer the National Advertising Fund, or directly create marketing materials or tools." Ex. A, Scurryfunge Franchise Agreement § 10.3.1; SE Michigan Franchise Agreement §

10.3.1.

82. UFG's 2024 income statement, attached as an exhibit to its 2025 FDD, reflects that UFG paid $530,861.00 in corporate salaries from the National Advertising Fund, which constitutes over 50% of the total National Advertising Fund contributions collected in 2024 of approximately $1 million. Yet, UFG represents elsewhere in its 2025 FDD that the monies in the 2024 National Advertising Fund were spent as follows: "33.1% on business-to-consumer advertising, including the creation and distribution of consumer advertising, 31.3% on business-to-business advertising, including the creation, development, funding, and maintenance of national account programs, 9.1% on advertising tools, including tools to reach customers through various platforms, and 26.5% on website hosting, development, maintenance, and optimization and the development of new online tools." Ex. E, 2025 FDD, Item 11.

83. The $530,861.00 in corporate salaries UFG paid out of the National Advertising Fund in 2024 constituted the use of National Advertising Fund Contributions to defray UFG's general operating expenses, in direct contravention of Section 10.3.1 of the Franchise Agreements. Those salaries were not "reasonable costs and expenses . . . incur[red] in activities reasonably related to the administration of the National Advertising Fund." Nor, as to the 2022-Form Franchise Agreements, were they, on information and belief, salaries "of employees

who manage marketing agencies, administer the National Advertising Fund, or directly create marketing materials or tools"; on information and belief, the salaries paid from the Fund included the salaries of UFG executives and corporate personnel whose responsibilities do not relate to the administration of the Fund or the creation of marketing materials or tools.

84. In reality, and according to UFG's own financial statements, the majority of the National Advertising Fund has been used to pay for corporate salaries and annual conferences focused on building UFG's corporate relationships with third-party vendors, and for the personal preferences and luxuries of UFG's founder (e.g., VIP tickets to NASCAR events). Meanwhile, significant expenses are paid out of the National Advertising Fund to marketing firms such as 919 Marketing, which have added little to no value to the franchisees' businesses, and the brand's website capabilities and overall online presence—on which UFG claims to have devoted significant portions of the Fund—remain severely lacking. When these improper expenditures have been brought to UFG's attention, franchisees' concerns have been met with resistance, hostility, and/or silence.

85. Section 10.3.4 of GR Moving's 2021-Form Franchise Agreement provides: "An accounting of the operation of the National Advertising Fund **shall be prepared annually and shall be available to Franchisee upon request**." Ex. A, GR Moving Franchise Agreement § 10.3.4 (emphasis added). Under GR

Moving's Franchise Agreement, the annual accounting itself—not merely a summary of it—must be made available to the franchisee upon request.

86. Section 10.3.4 of the 2022-Form Franchise Agreements provides that "[a]n accounting of the operation of the National Advertising Fund shall be prepared annually and high-level summary shall be available to Franchisee upon request." Ex. A, Scurryfunge Franchise Agreement § 10.3.4; SE Michigan Franchise Agreement § 10.3.4.

87. By letter dated November 25, 2024, counsel for UNITY Franchise Owners Group, an association which represents over 60% of the UNITS franchise network, which includes Plaintiffs, requested an accounting and audit of the National Advertising Fund. UFG ignored and/or refused those requests, providing at most high-level summary data published to the entire network, which lacks any detail and which conflicts with the information in UFG's own financial statements. UFG has never made the annual accounting available to Plaintiffs. Moreover, the summary data UFG provided to Plaintiffs was materially inaccurate and misleading: it is flatly contradicted by UFG's own financial statements, as alleged in paragraphs 82 through 84, *supra*.

***(v) UFG's Exploitation of Plaintiffs' Marketing Leads***

88. In addition to contributing two percent (2%) of their monthly Gross Sales to the National Advertising Fund, Plaintiffs generate their own sales leads

through their own paid local advertising. Section 10.2 of each of the Franchise Agreements separately requires each Plaintiff to "spend a minimum of $3,000 each month on local advertising within the Protected Territory"—a required minimum that escalates to as much as $4,500 per month as the franchise's monthly revenues grow. UFG does not conduct meaningful lead-generation marketing for its franchisees.

89. LDM occurs when a customer moves from one UNITS territory to another. UFG operates the LDM program but has no lead-generation source of its own for LDM business. Instead, UFG relies on the leads Plaintiffs generate and pay for: when a customer who finds a Plaintiff through the Plaintiff's own advertising and local presence requests a long-distance move, UFG requires the Plaintiff to route that customer to UFG, which then services the move and collects the revenue—regardless of whether the Plaintiff participates in the LDM. SE Michigan's personnel, for example, were required to forward LDM customer calls to UFG and to remain on the line while UFG's corporate staff pitched the customer.

90. Plaintiffs pay for every such lead, including the LDM customers they are required to hand over to UFG. UFG pays Plaintiffs nothing for these self-funded leads—or, at most, a flat per-move amount that does not vary with the distance of the move or the revenue UFG collects—even though UFG monetizes them, servicing the resulting moves and, in many cases, earning substantial revenue from a single

customer a Plaintiff paid to generate. UFG has thus been enriched at Plaintiffs' expense, receiving for free the benefit of marketing that Plaintiffs funded.

91. GR Moving's 2021-Form Franchise Agreement contains no provision addressing Long-Distance Moving, any obligation on the part of GR Moving to participate in an LDM program, any routing of customers or customer leads to UFG, or any allocation of LDM revenue. UFG's appropriation of the self-funded customer leads of GR Moving, and its retention of LDM revenue attributable to services GR Moving performed, are therefore governed by no contract term.

92. When GR Moving stopped volunteering for LDM assignments on UFG's terms, UFG responded in two ways. First, it began sending 24-hour "accept or be deemed to have declined" ultimatums. Second, it routed the business elsewhere, engaging UFG's own competitors to deliver a container to a customer located within GR Moving's Protected Territory. UFG's conduct in engaging a party other than its own franchisees to perform UNITS delivery services within GR Moving's Protected Territory contravened Section 1.4 of the GR Moving Franchise Agreement, which provides that UFG "shall not establish and operate, nor license any party other than Franchisee to establish and operate, any UNITS® Business or substantially similar business within" the Protected Territory during the term.

93. As to Scurryfunge and SE Michigan, Section 12.15 of the 2022-Form Franchise Agreements provides only that UFG "is currently the only approved Long-

Distance Moving service provider," that UFG "may collect payment directly from customers and may remit payments to Franchisee, less all fees, costs and expenses for services provided," and that UFG "reserves the right to require Franchisee to enter into Franchisor's designated form of Long-Distance Moving addendum or agreement, effective on notice to Franchisee." Ex. A, Scurryfunge Franchise Agreement § 12.15; SE Michigan Franchise Agreement § 12.15. No Plaintiff ever received notice of, or executed, any Long-Distance Moving addendum or agreement, and UFG never gave notice requiring one before demanding participation. Section 12.15 does not authorize UFG to appropriate, without compensation, the customer leads Plaintiffs generated and paid for. Nor does Section 12.15 state that any payment Scurryfunge and SE Michigan would receive for their participation in LDM would be a flat fee—regardless of the type of service provided.

**H. Plaintiffs' Discovery of the Concealed Facts**

94. Plaintiffs did not know, and in the exercise of reasonable diligence could not have known, of the facts constituting the violations alleged herein—including the true source, availability, and market price of the required containers and equipment, the magnitude of UFG's mark-up, and UFG's misuse of the National Advertising Fund—until late 2024 at the earliest, when Plaintiffs' attempts to source containers at a more affordable cost revealed UFG's instruction to its vendors not to deal with Plaintiffs, and when UFG's 2025 FDD (issued in April 2025) first

disclosed the 2024 income statement reflecting the payment of $530,861.00 in corporate salaries from the National Advertising Fund. UFG's affirmative concealment prevented any earlier discovery.

95. All conditions precedent to bringing this action have been waived, excused, performed, or otherwise occurred.

96. As a result of UFG's untrue statements and omissions of material fact, its material breaches of the Franchise Agreements, and Plaintiffs' need to protect and enforce their legal rights, Plaintiffs have retained the undersigned attorneys and are obligated to pay them reasonable attorneys' fees and costs. Plaintiffs seek to recover their attorneys' fees and costs from UFG pursuant to M.C.L. § 445.1531 and, to the extent applicable, Section 21.4 of the Franchise Agreements.

## COUNT I
## Fraudulent Misrepresentation
## (In the Alternative to Counts IV, V, VI, and VII)

97. Plaintiffs incorporate paragraphs 1 through 96, *supra*, as if fully set forth herein.

98. As fully set forth in paragraphs 22 through 24, 27, 34, and 40, *supra*, UFG furnished a Franchise Disclosure Document to each Plaintiff before that Plaintiff executed its Franchise Agreement—the 2021 FDD to GR Moving on or about August 3, 2021, and the 2022 FDD to Scurryfunge and to SE Michigan on the dates alleged in paragraphs 23 and 24—and in each FDD made the following

material representations of then-existing fact in writing: (i) in Item 8, that UFG was "the only approved supplier" and "the exclusive supplier" of the Containers and UNITS Equipment and that "there are no alternate sources of supply"; (ii) in Item 11, that the required operating software was UFG's "proprietary software, UNITS® Operating Software," which UFG had "developed" and which "has been used by our affiliates in the operation of a similar business since January of 2005"; and (iii) in Item 8, the specific dollar amounts and percentages of revenue UFG derived from franchisee-required purchases and leases.

99. As fully set forth in paragraphs 28 through 31, 34, and 41, *supra*, those representations were false when made. UFG was not the exclusive or only approved supplier of the Containers and UNITS Equipment, and alternate sources of supply existed: third-party manufacturers, including Boxwell and Cardinal, sold the identical products to the general public and to UFG's competitors at materially lower prices. The software UFG designated and required Plaintiffs to use was SiteLink, a third party's off-the-shelf product that UFG had not developed and did not own. And, on information and belief, the revenue figures UFG quantified in Item 8 understated the revenue, rebates, markups, and other consideration UFG in fact derived from franchisee-required purchases.

100. As fully set forth in paragraphs 25, 31, and 41, *supra*, UFG knew these representations were false when made, or made them recklessly, without any

knowledge of their truth, and as positive assertions. UFG alone drafted the FDDs, itself contracted with and paid the third-party manufacturers, itself set the prices at which it resold their products to Plaintiffs, and necessarily knew the identity and ownership of the software it designated.

101. UFG made these representations in connection with its offer and sale of franchises in Michigan with the intention that prospective franchisees, including Plaintiffs, act upon them in deciding whether to invest.

102. As fully set forth in paragraphs 44 through 48, *supra*, each Plaintiff acted in reasonable and justifiable reliance on those representations in deciding to invest in the UNITS franchise opportunity.

103. As a direct and proximate result of Plaintiffs' reliance on UFG's false representations, Plaintiffs have suffered damages, including their initial franchise investments, the excessive amounts paid to UFG for equipment that was neither exclusive to UFG nor available only from it, the fees paid for software that was a third party's off-the-shelf product, and consequential business losses, in amounts to be proven at trial.

**WHEREFORE,** Plaintiffs respectfully request that this Court: (i) award actual, compensatory, consequential, and incidental damages against UFG in an amount to be proven at trial; (ii) award pre- and post-judgment interest; and (iii) grant such other and further relief as the Court deems just and proper.

## COUNT II
## Silent Fraud / Fraudulent Concealment
## (In the Alternative to Counts IV, V, VI, and VII)

104. Plaintiffs incorporate paragraphs 1 through 96, *supra*, as if fully set forth herein.

105. As fully set forth in paragraphs 59 through 64, *supra*, throughout the franchise relationship and after each Plaintiff signed its Franchise Agreement, UFG had superior and, in material respects, exclusive knowledge of facts not reasonably discoverable by Plaintiffs, including that the UNITS containers and mules were off-the-shelf products manufactured by Boxwell and Cardinal and sold to the public at materially lower prices, and that UFG resold those products to Plaintiffs at a concealed and excessive markup.

106. UFG was under a duty to disclose those facts to Plaintiffs during the franchise relationship because: (i) Plaintiffs made direct inquiries of UFG concerning the cost of containers and the availability of alternative suppliers, which UFG answered incompletely and misleadingly, as fully set forth in paragraphs 55 and 62, *supra*; (ii) UFG made partial and misleading representations during the relationship—that no alternate sources of supply existed and that all purchasing had to route through UFG—while suppressing the facts that rendered those statements misleading; and (iii) UFG actively concealed those facts, as fully set forth in paragraphs 60 through 62, *supra*.

107. As fully set forth in paragraphs 57, 60 through 62, *supra*, UFG intentionally concealed and suppressed these facts, including by directing Boxwell not to communicate or transact directly with franchisees and by instructing franchisees in writing not to contact UFG's manufacturers, for the purpose of preventing Plaintiffs from discovering the truth and inducing Plaintiffs to continue purchasing containers, mules, trucks, and equipment exclusively through UFG at inflated prices.

108. Plaintiffs, ignorant of the concealed facts and unable to discover them through reasonable diligence given UFG's active concealment, relied on UFG's silence and partial representations and continued to purchase equipment exclusively through UFG. As fully set forth in paragraph 64, *supra*, had Plaintiffs known the concealed facts, they would have purchased equipment from alternative sources at lower prices and would not have paid UFG's inflated markup.

109. As a direct and proximate result of UFG's fraudulent concealment, Plaintiffs have suffered damages, including the excessive amounts paid to UFG for non-proprietary equipment and related losses, in amounts to be proven at trial.

**WHEREFORE,** Plaintiffs respectfully request that this Court: (i) award actual, compensatory, consequential, and incidental damages against UFG in an amount to be proven at trial; (ii) award pre- and post-judgment interest; and (iii) grant such other and further relief as the Court deems just and proper.

**COUNT III**
**Negligent Misrepresentation**
**(In the Alternative to Counts I, II, IV, V, VI, and VII)**

110. Plaintiffs incorporate paragraphs 1 through 96, *supra*, as if fully set forth herein.

111. As fully set forth in paragraphs 27, 34, 40, 55, and 62, *supra*, UFG made the representations identified in paragraph 98, *supra*, in the FDD furnished to each Plaintiff, and repeated the substance of its exclusive-supply representations to Plaintiffs during the franchise relationship in connection with Plaintiffs' continuing purchasing decisions. Those representations were false.

112. UFG had a pecuniary interest in making these representations. As the party that alone drafted the FDDs, that controlled the supply chain, and that was contractually obligated under Section 12.2 of the Franchise Agreements to supply the UNITS Equipment at competitive prices, UFG owed Plaintiffs a duty to exercise reasonable care in communicating accurate information regarding the source, availability, and cost of the equipment Plaintiffs were required to purchase and the ownership of the software they were required to use.

113. As fully set forth in paragraphs 28 through 31, 41, and 59 through 62, *supra*, UFG breached that duty and failed to exercise reasonable care in communicating accurate information, the true information having been within UFG's own knowledge and control.

114. As fully set forth in paragraphs 44 through 48, *supra*, Plaintiffs justifiably relied on UFG's representations in investing in the UNITS franchise system and in continuing to purchase equipment through UFG, and suffered pecuniary loss as a direct and proximate result, in amounts to be proven at trial.

**WHEREFORE,** Plaintiffs respectfully request that this Court: (i) award actual and compensatory damages against UFG in an amount to be proven at trial; (ii) award pre- and post-judgment interest; and (iii) grant such other and further relief as the Court deems just and proper.

## COUNT IV
## Breach of Contract—National Advertising Fund

115. Plaintiffs incorporate paragraphs 1 through 96, *supra*, as though fully set forth herein.

116. Each Plaintiff entered into a valid and binding Franchise Agreement with UFG, as identified in paragraphs 7 through 9, *supra*, for the operation of a UNITS franchised business, and Plaintiffs performed their obligations thereunder, including by making the National Advertising Fund Contributions that Section 10.3 requires.

117. As fully set forth in paragraphs 79 through 84, *supra*, UFG breached Section 10.3.1 of the Franchise Agreements by using National Advertising Fund Contributions to defray its general operating expenses, including by using over 50% of the approximately $1 million in total contributions collected in 2024 on corporate

salaries; by using National Advertising Fund Contributions to pay for annual conferences focused on building UFG's corporate relationships with third-party vendors; and by using National Advertising Fund Contributions to pay for personal preferences and luxuries, including VIP tickets to NASCAR events. As to GR Moving, Section 10.3.1 contains no exception for salaries of any kind. As to Scurryfunge and SE Michigan, the salaries paid from the Fund were, on information and belief, those of executives and corporate personnel who do not manage marketing agencies, administer the Fund, or directly create marketing materials or tools, and no exception in Section 10.3.1 permits Fund monies to be spent on vendor-relationship conferences or sporting-event tickets.

118. As fully set forth in paragraphs 85 through 87, *supra*, UFG further breached Section 10.3.4 of the Franchise Agreements: as to GR Moving, by refusing to make available the annual accounting of the Fund to which GR Moving's 2021-Form Franchise Agreement entitles it upon request; and as to Scurryfunge and SE Michigan, by furnishing, in place of the "high-level summary" the 2022-Form Franchise Agreements require, summary data that was materially inaccurate and that UFG's own financial statements contradict.

119. As fully set forth in paragraphs 75 and 76, *supra*, UFG further breached Section 10.3 by computing and collecting National Advertising Fund Contributions on Gross Sales figures that UFG's own defective StoreSmart system had inflated

with erroneous and duplicate charges, and by refusing to return Contributions collected on charges later shown to be erroneous.

120. As a direct and proximate result of the above-described breaches, Plaintiffs have suffered and continue to suffer financial damages, including the National Advertising Fund Contributions that UFG diverted to its own general operating expenses and to the personal benefit of its founder, and the Contributions collected on revenue that did not exist, in amounts to be proven at trial.

**WHEREFORE,** Plaintiffs respectfully request that this Court: (i) award actual, compensatory, consequential, and incidental damages against UFG in an amount to be proven at trial; (ii) order UFG to make the annual accounting of the National Advertising Fund available to GR Moving in accordance with Section 10.3.4 of its Franchise Agreement; (iii) award pre- and post-judgment interest; and (iv) grant such other and further relief as the Court deems just and proper.

## COUNT V
## Breach of Contract—Unreasonable Profit and Non-Competitive Pricing

121. Plaintiffs incorporate paragraphs 1 through 96, *supra*, as though fully set forth herein.

122. Each Plaintiff entered into a valid and binding Franchise Agreement with UFG, as identified in paragraphs 7 through 9, *supra*, for the operation of a UNITS franchised business, and Plaintiffs performed their obligations thereunder.

123. As fully set forth in paragraphs 49 through 52, *supra*, Section 12.2 of the Franchise Agreements imposes affirmative obligations on UFG—UFG "shall make the UNITS Equipment available to Franchisee in reasonable quantities" and "commits to provide the UNITS Equipment at competitive prices," reserving only "the right to earn a reasonable profit"—and UFG breached Section 12.2 by: (i) charging Plaintiffs prices for containers, mules, trailers, trucks, and other equipment that were not competitive; and (ii) earning a profit on the sale of that equipment that was commercially unreasonable.

124. As fully set forth in paragraphs 37 and 38, *supra*, UFG further breached Section 12.2's obligation to make the UNITS Equipment available in reasonable quantities and in accordance with its stated ordering and shipping procedures by subjecting Plaintiffs to delivery delays of six months to nearly a year, including the delay that prevented GR Moving from opening until after the 2022 peak season had passed.

125. As a direct and proximate result of the above-described breaches, Plaintiffs have suffered and continue to suffer financial damages, including the difference between the prices UFG charged and the competitive prices at which the identical equipment was available, the rental charges UFG imposed for substitute equipment, and the revenue Plaintiffs lost while awaiting delivery, in amounts to be proven at trial.

**WHEREFORE,** Plaintiffs respectfully request that this Court: (i) award actual, compensatory, consequential, and incidental damages against UFG in an amount to be proven at trial; (ii) award pre- and post-judgment interest; and (iii) grant such other and further relief as the Court deems just and proper.

**COUNT VI**
**Breach of Contract Accompanied by a Fraudulent Act**
**(In the Alternative to Counts I, II, and III)**

126. Plaintiffs incorporate paragraphs 1 through 96, *supra*, as though fully set forth herein.

127. Each Plaintiff entered into a valid and binding Franchise Agreement with UFG, as identified in paragraphs 7 through 9, *supra*, for the operation of a UNITS franchised business, and Plaintiffs performed their obligations thereunder.

128. As fully set forth in paragraphs 49 through 52, *supra*, UFG breached Section 12.2 of the Franchise Agreements by charging Plaintiffs prices for containers, mules, trailers, trucks, and other equipment that were not competitive and by earning a profit on the sale of that equipment that was commercially unreasonable.

129. UFG's breach was accompanied by fraudulent intent relating to the breach itself, and not merely to the making of the Franchise Agreements. As fully set forth in paragraphs 52, 59, and 60, *supra*, throughout the franchise relationship, and each time it sold equipment to Plaintiffs, UFG knew that the prices it charged

were not competitive and that its profit was not reasonable because UFG itself purchased the containers and mules directly from their manufacturers and knew the prices at which those manufacturers sold identical products to other purchasers. UFG intended to continue breaching its pricing obligations while preventing Plaintiffs from discovering the breach, for the purpose of preserving the concealed markup that the breach generated.

130. UFG's breach was accompanied by fraudulent acts characterized by dishonesty in fact and unfair dealing. As fully set forth in paragraphs 52, 57, and 59 through 62, *supra*, contemporaneously with and in furtherance of its ongoing breach, UFG intentionally concealed from Plaintiffs the true source of the equipment, its true market price, and the magnitude of UFG's markup—issuing sales orders that disclosed only a single unit price, representing that no alternate sources of supply existed, and instructing its approved vendors and its franchisees not to deal directly with one another. Each of these acts occurred during the contractual relationship, after each Plaintiff executed its Franchise Agreement, and accompanied UFG's breach of its pricing obligations.

131. As a direct and proximate result of UFG's breach of contract accompanied by fraudulent acts, Plaintiffs have suffered and continue to suffer financial damages, including the difference between the prices UFG charged and the competitive prices at which the identical equipment was available, in amounts to be

proven at trial. Because UFG's breach was accompanied by fraudulent acts and undertaken with fraudulent intent, willfully, wantonly, and in reckless disregard of Plaintiffs' rights, Plaintiffs are further entitled to punitive damages.

**WHEREFORE,** Plaintiffs respectfully request that this Court: (i) award actual, compensatory, consequential, and incidental damages against UFG in an amount to be proven at trial; (ii) award punitive damages; (iii) award pre- and post-judgment interest; and (iv) grant such other and further relief as the Court deems just and proper.

## COUNT VII
## Breach of Contract—Express Duty of Reasonableness and Good Faith (Section 21.14)

132. Plaintiffs incorporate paragraphs 1 through 96, *supra*, as though fully set forth herein.

133. Each Plaintiff entered into a valid and binding Franchise Agreement with UFG, as identified in paragraphs 7 through 9, *supra*, for the operation of a UNITS franchised business, and Plaintiffs performed their obligations thereunder.

134. As fully set forth in paragraph 54, *supra*, Section 21.14 of each Franchise Agreement is an express term of the contract providing that "both Franchisor and Franchisee shall act reasonably and in good faith" in order to "honor the intent and purpose of [the] Agreement," and that a party whose consent is required or contemplated "shall not unreasonably withhold consent." This Count is

brought for breach of that express contractual term and not for breach of any covenant implied at law.

135. Section 21.14 governs, among other things, the manner in which UFG exercises the discretion the Franchise Agreements confer upon it, including its discretion under: (a) Section 9.2, to change or modify the System and to require Plaintiffs to make only such expenditures as those changes "may reasonably require," as fully set forth in paragraph 66, *supra*; (b) Section 11.5, to designate the required computer and point-of-sale system and its fees, as fully set forth in paragraph 65, *supra*; (c) Section 10.3, to maintain and administer the National Advertising Fund, as fully set forth in paragraph 79, *supra*; (d) Sections 12.1 and 12.2, to designate the source of the UNITS Equipment, to set its price, and to approve or reject alternative suppliers, as fully set forth in paragraphs 49 through 53, *supra*; and (e) as to Scurryfunge and SE Michigan, Section 12.15, to administer the Long-Distance Moving program, as fully set forth in paragraph 93, *supra*.

136. As fully set forth in paragraphs 49 through 93, *supra*, UFG breached Section 21.14 by failing to act reasonably and in good faith through the following actions: (a) exercising its discretion under Sections 9.2 and 11.5 to designate StoreSmart and to mandate its systemwide implementation in the middle of the industry's peak season, with less than one month's notice, while knowing that the system contained numerous unresolved defects and might not be able to

accommodate every franchisee, and thereafter requiring Plaintiffs to bear duplicative software expenditures that the change did not reasonably require, for a system UFG knew did not work; (b) exercising its discretion to administer the National Advertising Fund by directing the Fund's monies to UFG's corporate salaries, to its vendor-relationship conferences, and to the personal preferences and luxuries of its founder, rather than to advertising benefiting the franchise system; (c) exercising its discretion under Sections 12.1 and 12.2 to designate itself the exclusive source of non-proprietary equipment and to set the prices Plaintiffs were required to pay, charging non-competitive prices and extracting an unreasonable profit while concealing the true source and market price of that equipment; (d) unreasonably withholding consent to alternative suppliers by rejecting franchisees' requests categorically, without explanation, without applying the criteria specified in Section 12.1, and without any legitimate business justification, and interfering with Plaintiffs' relationships with UFG's own approved vendors by instructing those vendors not to deal directly with franchisees; (e) computing and collecting royalties and National Advertising Fund Contributions on revenue that UFG's own defective StoreSmart system had erroneously recorded, and refusing to return royalties collected on erroneous charges identified outside a 90-day and later 120-day window; and (f) requiring Plaintiffs to route to UFG the Long-Distance Moving customers generated by Plaintiffs' own contractually mandated local advertising

while paying Plaintiffs nothing or a flat per-move amount, imposing 24-hour "accept or be deemed to have declined" ultimatums, and engaging parties other than its franchisees to perform UNITS delivery services within Plaintiffs' territories.

137. As a direct and proximate result of UFG's breaches of Section 21.14, Plaintiffs have suffered and will continue to suffer substantial damages, including but not limited to: (i) lost profits and business opportunities; (ii) excessive costs for equipment, containers, and software; (iii) business disruption and operational losses caused by the defective StoreSmart system; (iv) wasted National Advertising Fund Contributions; and (v) other financial damages to be proven at trial.

**WHEREFORE,** Plaintiffs respectfully request that this Court: (i) award actual, compensatory, consequential, and incidental damages against UFG in an amount to be proven at trial; (ii) award pre- and post-judgment interest; and (iii) grant such other and further relief as the Court deems just and proper.

**COUNT VIII**
**Violation of the Michigan Franchise Investment Law ("MFIL")**
**M.C.L. §§ 445.1501 et seq.**

138. Plaintiffs incorporate paragraphs 1 through 96, *supra*, as if fully set forth herein.

139. Plaintiffs are Michigan entities that purchased UNITS franchises from UFG for operation in Michigan, and UFG offered and sold those franchises in Michigan, as alleged in paragraphs 7 through 9, 15, and 22 through 24, *supra*.

Plaintiffs are therefore entitled to the protections of the MFIL, M.C.L. § 445.1501 *et seq*.

140. M.C.L. § 445.1505 makes it unlawful for a person, in connection with the filing, offer, sale, or purchase of any franchise, directly or indirectly, to: "(a) [e]mploy any device, scheme, or artifice to defraud[;]" "(b) [m]ake any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading[;]" or "(c) [e]ngage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person."

141. As fully set forth in paragraphs 15 through 21, *supra*, the FTC Franchise Rule, 16 C.F.R. Part 436, sets forth comprehensive requirements for franchise disclosure documents, and UFG was required to make truthful and complete disclosures in the FDD it furnished to each Plaintiff.

142. As fully set forth in paragraphs 27 through 31, 34, and 40 through 41, *supra*, and in paragraphs 98 through 99, *supra*, UFG made untrue statements of material fact in Items 8 and 11 of the FDD furnished to each Plaintiff, in violation of M.C.L. § 445.1505(b).

143. As fully set forth in paragraphs 33 through 36, *supra*, UFG also omitted to state material facts in Item 8 of its FDDs, including: the identity of the third parties that actually manufacture the Containers and UNITS Equipment; that those

manufacturers sell the identical products to the general public and to UFG's competitors at materially lower prices; the basis for and magnitude of the markup, rebates, and other consideration UFG received in connection with franchisee-required purchases; and the purchasing restrictions UFG imposed in practice.

144. Each of those omitted facts was necessary in order to make statements UFG did make in Item 8, in the light of the circumstances under which they were made, not misleading. Specifically: (i) UFG's statements that it was "the only approved supplier" and "the exclusive supplier" of the Containers and UNITS Equipment and that "there are no alternate sources of supply" were rendered misleading by UFG's failure to disclose that third parties manufactured those products and sold the identical products to the general public and to UFG's competitors, and that UFG's exclusivity was a purchasing restriction UFG imposed rather than a characteristic of the goods; (ii) UFG's statement that it "reserve[d] the right to derive revenue based on your required purchases or leases," and its quantification of that revenue, were rendered misleading by UFG's failure to disclose the basis for and magnitude of the markup, rebates, and other consideration it derived through its vendor relationships—a disclosure Item 8 of the FTC Franchise Rule independently requires and which treats as a "payment" to the franchisor "the sale of similar goods or services to the franchisor at a lower price than to franchisees," as fully set forth in paragraph 18, *supra*; and (iii) UFG's statement of

the criteria it would apply to alternative-supplier requests was rendered misleading by UFG's failure to disclose that it required all container and equipment purchasing to go through UFG regardless of those criteria.

145. UFG made these untrue statements and omissions willfully, knowing they were false or with reckless disregard for their truth or falsity, for the purpose of inducing Plaintiffs to purchase UNITS franchises, as fully set forth in paragraphs 25, 31, and 41, *supra*.

146. As fully set forth in paragraphs 43 through 47, *supra*, each Plaintiff received its FDD before executing its Franchise Agreement and justifiably relied upon the accuracy and completeness of UFG's FDD in making its decision to invest in a UNITS franchise. Had the omitted facts been disclosed, no Plaintiff would have invested in the UNITS system, or would have done so only on materially different terms.

147. As fully set forth in paragraphs 28 through 31, 57 through 63, *supra*, UFG further violated M.C.L. § 445.1505(a) and (c) by employing, in connection with its offer and sale of franchises to Plaintiffs, a device, scheme, and course of business that operated as a fraud or deceit upon them: UFG sold franchises on the representation of an exclusive supply arrangement that did not exist, structured all purchasing to route through itself so that its markup would remain hidden, instructed its approved vendors and its franchisees not to deal with one another, and carried

that concealment forward from the point of sale so that Plaintiffs would not discover what they had in fact purchased.

148. As fully set forth in paragraphs 63 and 94, *supra*, Plaintiffs did not discover, and in the exercise of reasonable diligence could not have discovered, the facts constituting UFG's violations until late 2024 at the earliest, because UFG affirmatively and fraudulently concealed those facts prior to and throughout the franchise relationship.

149. As a direct and proximate result of UFG's violations of M.C.L. § 445.1505, Plaintiffs have suffered substantial pecuniary losses, including their initial franchise investments, the excessive amounts paid for equipment purchased at inflated prices, and the software fees, in amounts to be proven at trial. Pursuant to M.C.L. § 445.1531(1), Plaintiffs are entitled to recover their damages, together with interest at twelve percent (12%) per year from the date of purchase, and their reasonable attorney fees and court costs.

150. Pursuant to M.C.L. § 445.1527(b), any provision of the Franchise Agreements purporting to require Plaintiffs to assent to a release, assignment, novation, waiver, or estoppel that deprives them of the rights and protections of the MFIL—including any provision purporting to shorten the period within which Plaintiffs may bring an action under the MFIL—is void and unenforceable as applied to this Count.

**WHEREFORE,** Plaintiffs respectfully request that this Court: (i) award actual damages against UFG in an amount to be proven at trial, with statutory interest pursuant to M.C.L. § 445.1531(1); (ii) award Plaintiffs their reasonable attorneys' fees and court costs pursuant to M.C.L. § 445.1531(1); (iii) award pre- and post-judgment interest; and (iv) grant such other and further relief as the Court deems just and proper.

**COUNT IX**
**Breach of Contract—Long-Distance Moving (Section 12.15)**
**(Scurryfunge and SE Michigan)**

151. Plaintiffs Scurryfunge and SE Michigan incorporate paragraphs 1 through 96, *supra*, as though fully set forth herein.

152. Scurryfunge and SE Michigan each entered into a valid and binding Franchise Agreement with UFG on the 2022-Form Franchise Agreement, as identified in paragraphs 7, 8, 23, and 24, *supra*, and each performed its obligations thereunder, including by spending on local advertising within its Protected Territory the minimum monthly amounts that Section 10.2 requires.

153. As fully set forth in paragraph 93, *supra*, Section 12.15 of the 2022-Form Franchise Agreements is the only provision of those agreements addressing Long-Distance Moving. It provides that when UFG collects payment directly from customers for LDM, it would "remit payments to Franchisee, less all fees, costs and expenses for services provided"; and provides that UFG "reserves the right to require

Franchisee to enter into Franchisor's designated form of Long-Distance Moving addendum or agreement, effective on notice to Franchisee."

154. Section 12.15 thus establishes a single contractual mechanism by which UFG, having collected a Long-Distance Moving customer's payment, compensates the franchisee whose customer it was: remittance of that payment less UFG's fees, costs, and expenses for the services UFG provided. It further establishes a single contractual vehicle—a designated Long-Distance Moving addendum or agreement, effective on notice—by which UFG may impose different or additional terms. Section 12.15 does not authorize UFG to retain the entire customer payment, to substitute for the remittance it describes a flat per-move amount unrelated to the payment collected or to the services UFG provided, or to require a franchisee's participation on terms UFG has never reduced to the addendum or agreement that Section 12.15 contemplates.

155. As fully set forth in paragraphs 88 through 90 and 93, *supra*, UFG breached Section 12.15 by: (i) requiring Scurryfunge and SE Michigan to route to UFG the Long-Distance Moving customers those Plaintiffs generated through their own contractually mandated local advertising—including by requiring SE Michigan's personnel to forward customer calls to UFG and remain on the line while UFG's corporate staff sold the move—and then retaining the entire customer payment, or remitting only a flat per-move amount that bore no relation to the

payment UFG collected less its fees, costs, and expenses for the services it provided; and (ii) demanding and enforcing that participation without ever giving Scurryfunge or SE Michigan notice of, or tendering, the Long-Distance Moving addendum or agreement that Section 12.15 makes the exclusive means of imposing any such terms.

156. As a direct and proximate result of UFG's breaches of Section 12.15, Scurryfunge and SE Michigan have suffered and continue to suffer damages, including the unremitted portion of the Long-Distance Moving revenue UFG collected from customers those Plaintiffs generated and paid to acquire, in amounts to be proven at trial.

**WHEREFORE**, Plaintiffs Scurryfunge and SE Michigan respectfully request that this Court: (i) award actual, compensatory, consequential, and incidental damages against UFG in an amount to be proven at trial; (ii) award pre- and post-judgment interest; and (iii) grant such other and further relief as the Court deems just and proper.

**COUNT X**
**Unjust Enrichment—Long-Distance Moving Revenue**
**(GR Moving; and, in the Alternative to Count IX, Scurryfunge and SE Michigan)**

157. Plaintiffs incorporate paragraphs 1 through 96, *supra*, as if fully set forth herein.

158. As fully set forth in paragraphs 91 and 93, *supra*, GR Moving's 2021-Form Franchise Agreement contains no provision governing Long-Distance Moving, the routing of customer leads to UFG, or the allocation of Long-Distance Moving revenue; and, Scurryfunge and SE Michigan bring this Count in the alternative to Count IX, to the extent the Court determines that Section 12.15 of the 2022-Form Franchise Agreements does not govern UFG's appropriation of the customer leads those Plaintiffs generated and paid for, or that, because UFG never gave the notice or obtained the addendum Section 12.15 contemplates, no contract term governs the parties' Long-Distance Moving dealings.

159. Plaintiffs conferred a benefit upon UFG. As fully set forth in paragraphs 88 through 90, *supra*, Plaintiffs paid for and generated customer leads through their own paid advertising, including the minimum monthly local advertising expenditures the Franchise Agreements required them to make. When a customer that a Plaintiff had acquired through that self-funded advertising requested a long-distance move, UFG required the Plaintiff to route that customer to UFG.

160. UFG realized and appreciated that benefit. As fully set forth in paragraphs 89 and 90, *supra*, UFG has no lead-generation source of its own for Long-Distance Moving business. UFG serviced the resulting moves, collected the revenue from those moves directly from the customers, and in many cases earned substantial revenue from a single lead that a Plaintiff had paid to generate.

161. UFG retained that benefit without paying Plaintiffs anything in return, or at most a flat per-move amount bearing no relation to the revenue UFG collected, under circumstances that make its retention inequitable. UFG accepted the fruits of marketing expenditures it did not make, for a service line from which Plaintiffs derived no meaningful compensation, while simultaneously collecting royalties and National Advertising Fund Contributions from Plaintiffs and providing no meaningful lead-generation marketing of its own. When Plaintiffs declined to continue participating on those terms, UFG routed the resulting business within Plaintiffs' territories to parties other than its franchisees, as fully set forth in paragraph 92, *supra*.

162. Plaintiffs are entitled to restitution of the value of the benefit UFG received, including the reasonable value of the customer leads UFG appropriated and the revenue UFG derived from them, in an amount to be proven at trial.

**WHEREFORE,** Plaintiffs respectfully request that this Court: (i) award restitution of the value of the benefit UFG received and retained; (ii) award pre- and post-judgment interest; and (iii) grant such other and further relief as the Court deems just and proper.

## COUNT XI
## Violation of the South Carolina Unfair Trade Practices Act, S.C. Code Ann. § 39-5-10 *et seq.*

163. Plaintiffs incorporate paragraphs 1 through 96, *supra*, as if fully set

forth herein.

164. UFG is a South Carolina corporation that conducts its franchising business from Daniel Island, South Carolina, as alleged in paragraph 10, *supra*. The acts and practices alleged herein—UFG's design and administration of its container supply program, its pricing of the UNITS Equipment, its instructions to its vendors and franchisees, and its disclosures to franchisees—were conceived, directed, and carried out from UFG's South Carolina headquarters, in the conduct of trade or commerce within the meaning of S.C. Code Ann. § 39-5-10(b).

165. S.C. Code Ann. § 39-5-20(a) declares unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." An act is "unfair" when it is offensive to public policy or is immoral, unethical, or oppressive, and "deceptive" when it has a tendency to deceive.

166. As fully set forth in paragraphs 27 through 31, 36, 39, 49 through 52, and 59 through 62, *supra*, UFG engaged in unfair and deceptive acts and practices in the conduct of trade or commerce, including by: (i) representing to Plaintiffs that UFG was the exclusive supplier of the UNITS Containers and that there were no alternate sources of supply, when identical containers were available from the same manufacturers to the general public at materially lower prices; (ii) requiring Plaintiffs to purchase minimum quantities of Containers under the Container Quota while concealing that UFG resold those Containers at an undisclosed markup of

$1,000.00 or more per unit; (iii) selling Plaintiffs, at above-market prices, the lowest-grade container configuration its manufacturers offered—non-galvanized, with inferior coating and no drip edges—while concealing that the same manufacturers offered galvanized and better-equipped containers suited to Michigan's climate and refusing to permit Plaintiffs to obtain them elsewhere; (iv) structuring the Container Quota and its exclusive-supply requirement so that every Container that deteriorated prematurely was replaced through UFG at UFG's marked-up price, thereby profiting from the accelerated decay of the product it selected; and (v) instructing its manufacturers not to deal directly with franchisees, and instructing franchisees not to contact its manufacturers, so that Plaintiffs could not discover the product's true source, specifications, or price.

167. UFG's acts and practices were not isolated to Plaintiffs. As fully set forth in paragraphs 52, 55 through 58, and 60, *supra*, UFG applied the same exclusive-supply requirement, the same single-line-price sales orders, the same vendor and franchisee communication restrictions, and the same container specifications to every franchisee in the UNITS system through standardized procedures, and it continues to require Container purchases through itself or its designated vendor under the Container Quota. UFG's conduct therefore adversely affects the public interest because it has the potential for repetition and has, in fact, been repeated against franchisees throughout the UNITS system.

168. UFG's unfair and deceptive acts were more than a breach of the Franchise Agreements: they were accompanied by the concealment and misrepresentations alleged in paragraphs 59 through 62, *supra*, which UFG undertook for the purpose of preventing Plaintiffs from discovering the truth.

169. As a direct and proximate result of UFG's unfair and deceptive acts and practices, Plaintiffs have suffered an ascertainable loss of money and property, including the markup paid on Containers purchased under the Container Quota, the cost of repairing and prematurely replacing deteriorated Containers, and the difference between the prices UFG charged and the prices at which equivalent or superior containers were available, in amounts to be proven at trial.

170. UFG's violations were willful and knowing. UFG knew the true source, specifications, and price of the Containers because it purchased them itself, and it knew that the alternatives it withheld from Plaintiffs existed. Pursuant to S.C. Code Ann. § 39-5-140(a), Plaintiffs are entitled to recover their actual damages, trebled, together with their reasonable attorney's fees and costs.

**WHEREFORE**, Plaintiffs respectfully request that this Court: (i) award actual damages against UFG in an amount to be proven at trial; (ii) award treble damages pursuant to S.C. Code Ann. § 39-5-140(a); (iii) award Plaintiffs their reasonable attorney's fees and costs pursuant to S.C. Code Ann. § 39-5-140(a); (iv) award pre- and post-judgment interest; and (v) grant such other and further relief as

the Court deems just and proper.

**COUNT XII**
**Violation of the Michigan Consumer Protection Act,**
**M.C.L. § 445.901 *et seq.***
**(In the Alternative to Count XI)**

171. Plaintiffs incorporate paragraphs 1 through 96, *supra*, as if fully set forth herein.

172. Plaintiffs are Michigan entities that purchased UNITS Containers from UFG for use in Michigan, and UFG sold those Containers to Plaintiffs in Michigan, as alleged in paragraphs 7 through 9 and 49 through 52, *supra*.

173. M.C.L. § 445.903(1) declares unlawful "[u]nfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce, including:" "[f]ailing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer," *id.* § 445.903(1)(s); "[m]aking a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is," *id.* § 445.903(1)(bb); and "[f]ailing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner," *id.* § 445.903(1)(cc).

174. As fully set forth in paragraphs 27 through 31, 36, 39, 49 through 52, and 59 through 62, *supra*, UFG engaged in unfair, unconscionable, and deceptive acts and practices in connection with its sale of Containers to Plaintiffs, including

by: (i) representing that UFG was the exclusive supplier of the Containers and that there were no alternate sources of supply, when identical containers were available from the same manufacturers to the general public at materially lower prices, in violation of § 445.903(1)(bb); (ii) failing to reveal, in light of those positive representations, that UFG purchased the Containers from third-party manufacturers and resold them to Plaintiffs at an undisclosed markup of $1,000.00 or more per unit, in violation of § 445.903(1)(s) and (cc); (iii) failing to reveal that the Containers UFG sold Plaintiffs were the lowest-grade configuration its manufacturers offered and that galvanized and better-equipped containers suited to Michigan's climate were available from the same manufacturers, facts that Plaintiffs could not reasonably have known because UFG prohibited franchisees from communicating with those manufacturers, in violation of § 445.903(1)(s); and (iv) requiring Plaintiffs to purchase minimum quantities of Containers under the Container Quota, and to replace prematurely deteriorated Containers, exclusively through UFG at those marked-up prices.

175. UFG's acts and practices were material to Plaintiffs' Container purchases. As fully set forth in paragraphs 44 through 48 and 64, *supra*, Plaintiffs would not have paid UFG's prices, and would have purchased galvanized or otherwise superior containers from alternative sources, had UFG revealed the concealed facts.

176. As a direct and proximate result of UFG's violations of M.C.L. § 445.903(1), Plaintiffs have suffered loss, including the markup paid on Containers purchased under the Container Quota and the cost of repairing and prematurely replacing deteriorated Containers, in amounts to be proven at trial.

177. Pursuant to M.C.L. § 445.911(2), Plaintiffs are entitled to recover their actual damages, together with reasonable attorney fees.

**WHEREFORE**, Plaintiffs respectfully request that this Court: (i) award actual damages against UFG in an amount to be proven at trial pursuant to M.C.L. § 445.911(2); (ii) award Plaintiffs their reasonable attorney fees pursuant to M.C.L. § 445.911(2); (iii) award pre- and post-judgment interest; and (iv) grant such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs, Scurryfunge Inc., SE Michigan Storage Inc., and GR Moving and Storage, LLC, hereby demand a trial by jury on all issues so triable.

Dated: September 15, 2026

Respectfully submitted,

**ZARCO EINHORN SALKOWSKI, P.A.**
*Counsel for Plaintiffs*
One Biscayne Tower
2 S. Biscayne Blvd., 34th Floor
Miami, Florida 33131
Telephone: (305) 374-5418

By: */s/ Robert Zarco*
**ROBERT ZARCO** (FBN 502138)
E-mail: rzarco@zarcolaw.com
**HIMANSHU M. PATEL** (FBN 0167223)
E-mail: hpatel@zarcolaw.com
E-mail: acoro@zarcolaw.com
**F. ALAINA RODRIGUEZ** (FBN 1070046)
E-mail: farodriguez@zarcolaw.com

**SULLIVAN WARD PATTON GLEESON & FELTY, P.C.**
*Local Counsel for Plaintiffs*
400 Galleria Officentre, Suite 500
Southfield, Michigan 48034
Telephone: (248) 746-2744

**STEPHEN L. WITENOFF** (P29815)
E-mail: switenoff@sullivanwardlaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on September 15, 2026, I filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing to all parties on record.

By: s/ *Robert Zarco*